No. 16-55289

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

NOVATION VENTURES, LLC,

*Plaintiff-Appellant*,

v.

THE J.G. WENTWORTH COMPANY, LLC, A DELAWARE LIMITED LIABILITY COMPANY,
FORMERLY KNOWN AS JGWPT HOLDINGS, LLC; THE J.G. WENTWORTH COMPANY,
A DELAWARE CORPORATION, FORMERLY KNOWN AS JGWPT, INC.; J.G. WENTWORTH
S.S.C. LIMITED PARTNERSHIP, A NEVADA LIMITED PARTNERSHIP; AND PEACH
HOLDINGS, LLC, A DELAWARE LIMITED LIABILITY COMPANY DBA "PEACHTREE
FINANCIAL SOLUTIONS" AND AS "OLIVE BRANCH FUNDING,"

*Defendants-Appellees*.

_____

Appeal from the United States District Court for the Central District of California,
Western Division, Case No. 2:15-cv-00954-BRO-PJW,
Honorable Beverly Reid O'Connell

_____

## PLAINTIFF-APPELLANT'S OPENING BRIEF

_____

Maxwell M. Blecher
Courtney A. Palko
BLECHER COLLINS & PEPPERMAN, P.C.
515 South Figueroa Street, Suite 1750
Los Angeles, California 90071-3334
(213) 622-4222

## Corporate Disclosure Statement

Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiff-Appellant Novation Ventures, LLC does not have a parent corporation, subsidiaries, or affiliates that have issued shares to the public.

# Table of Contents

**Page**

Preliminary Statement.................................................................................1

Jurisdictional Statement ...........................................................................3

Issues Presented .......................................................................................3

Statement of the Case................................................................................4

    A.    The parties compete to buy future payments from settlement recipients. ...............................................................................4

    B.    JGW acquired its primary competitor Peachtree and enjoys monopsony power but deceptively markets commonly-owned-and-operated brands as competing entities. ...........................5

    C.    Post-merger, JGW systematically engages in anticompetitive conduct that harms competition, consumers, and competitors. ..............8

        1.    Structured settlement factoring transactions are individualized and privately negotiated.......................................9

        2.    Sellers typically seek two competing bids online......................11

        3.    JGW manipulates market conditions to exclude competition, thwart sellers' efforts to obtain competing bids, and maximize monopsony profits. ....................................12

Procedural Background...............................................................................14

Summary of Argument ...............................................................................15

Standard of Review....................................................................................18

Argument.....................................................................................................19

    I.    Novation plausibly alleges antitrust injury. .........................................19

        A.    Novation need not allege complete exclusion. ...........................21

        B.    Novation alleges antitrust injury as a result of harm to consumer welfare, reduced choice and output, and the deprivation of the benefit and vigor of true competition............28

C.     Novation alleges that JGW's post-merger abuse of its monopsony power in a highly concentrated market by engaging in pervasive anticompetitive deceptive bidding practices has caused more than a *de minimis* adverse effect on competition. ............................................... 35

D.     The district court misapplied the pleading standard. .................. 38

II.    Novation properly alleges a Lanham Act claim. ................................... 42

A.     Novation satisfies Rule 9(b) and *Twombly* pleading standards. ...................................................................................... 43

B.     Misleading advertising is actionable. ........................................... 43

C.     Novation's allegations that Defendants' duplicitous advertising deceives or tends to deceive consumers present fact questions as to likelihood of confusion. .................. 46

III.    Novation adequately states a UCL claim. ............................................ 50

Conclusion ................................................................................................................ 52

Request for Oral Argument ....................................................................................... 53

Statement of Related Cases ....................................................................................... 54

Certificate of Compliance ......................................................................................... 55

Certificate of Service ................................................................................................ 56

# Table of Authorities

**Page(s)**

## Cases

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
  592 F.3d 991 (9th Cir. 2010) ................................................................23
*AlliedSignal, Inc. v. B.F. Goodrich Co.*,
  183 F.3d 568 (7th Cir. 1999) ................................................ 17, 34, 35
*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
  190 F.3d 1051 (9th Cir. 1999) .................................................... 20, 34
*Am. Ad Mgmt., Inc. v. GTE Corp.*,
  92 F.3d 781 (9th Cir. 1996) ..................................................................30
*Am. Needle, Inc. v. Nat'l Football League*,
  560 U.S. 183 (2010) ..............................................................................24
*Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l
  Publ'ns, Inc.*,
  108 F.3d 1147 (9th Cir. 1997) .............................................................36
*Amarel v. Connell*,
  102 F.3d 1494 (9th Cir. 1996) .................................................... 29, 32
*Anderson News, L.L.C. v. Am. Media, Inc.*,
  680 F.3d 162 (2d Cir. 2012) ....................................................... 19, 39
*Apex Hosiery Co. v. Leader*,
  310 U.S. 469 (1940) ..................................................................... 30, 31
*Apple Inc. v. Amazon.com Inc.*,
  915 F. Supp. 2d 1084 (N.D. Cal. 2013) ..............................................47
*Aquashield, Inc. v. Sonitec Vortisand, Inc.*,
  No. 13–cv–119, 2013 WL 5524598 (E.D. Tenn. Oct. 4, 2013) ........45
*Arch Ins. Co. v. Allegiant Prof'l Servs., Inc.*,
  No. 11–1675, 2012 WL 5182891 (C.D. Cal. Oct. 15, 2012) ..............36
*Architectural Mailboxes, LLC v. Epoch Design, LLC*,
  No. 10cv974, 2011 WL 1630809 (S.D. Cal. Apr. 28, 2011) ..............43
*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
  472 U.S. 585 (1985) ..................................................................... 21, 22
*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
  459 U.S. 519 (1983) ..................................................................... 29, 32
*Atl. Richfield Co. v. USA Petroleum Co.*,
  495 U.S. 328 (1990) ..................................................................... 31, 32
*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ..............................................................................38

*Blue Shield of Va. v. McCready*,
  457 U.S. 465 (1982) ............................................................ *passim*
*Bon-Ton Stores, Inc. v. May Dep't Stores Co.*,
  881 F. Supp. 860 (W.D.N.Y. 1994) ...............................................20
*Broadcom Corp. v. Qualcomm Inc.*,
  501 F.3d 297 (3d Cir. 2007) ....................................................22
*Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*,
  174 F.3d 1036 (9th Cir. 1999) .............................................. 48, 50
*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962) ..................................................... 15, 17, 35
*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977) ........................................................ 20, 23
*Byars v. Bluff City News Co.*,
  609 F.2d 843 (6th Cir. 1979) .............................................. 37, 39
*Cal. v. Am. Stores Co.*,
  495 U.S. 271 (1990) .................................................. 16, 17, 34, 35
*Caribbean Broad. Sys., Ltd. v. Cable & Wireless P.L.C.*,
  148 F.3d 1080 (D.C. Cir. 1998) .................................................31
*CBS, Inc. v. Gusto Records, Inc.*,
  403 F. Supp. 447 (M.D. Tenn. 1974) ............................................46
*Coal. For ICANN Transparency, Inc. v. VeriSign, Inc.*,
  611 F.3d 495 (9th Cir. 2010) ..................................................30
*Conwood Co., L.P., v. United States Tobacco Co.*,
  290 F.3d 768 (6th Cir. 2002) .............................................. 22, 31
*Copperweld Corp. v. Independence Tube Corp.*,
  467 U.S. 752 (1984) ...........................................................24
*DocMagic, Inc. v. Ellie Mae, Inc.*,
  745 F. Supp. 2d 1119 (N.D. Cal. 2010) .........................................51
*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992) ...................................................... *passim*
*Expedia, Inc. v. Priceline.com Inc.*,
  No. 09-712, 2009 WL 4110851 (W.D. Wash. Nov. 23, 2009) .........................45
*F.T.C. v. H.J. Heinz Co.*,
  246 F.3d 708 (D.C. Cir. 2001) ........................................... 16, 17, 35
*F.T.C. v. Ind. Fed'n of Dentists*,
  476 U.S. 447 (1986) ....................................................... 30, 31
*F.T.C. v. Staples, Inc.*,
  970 F. Supp. 1066 (D.D.C. 1997) ...............................................16
*F.T.C. v. Swedish Match*,
  131 F. Supp. 2d 151 (D.D.C. 2000) .............................................16

*F.T.C. v. Sysco Corp.*,
    113 F. Supp. 3d 1 (D.D.C. 2015)........................................................16

*Feitelson v. Google Inc.*,
    80 F. Supp. 3d 1019 (N.D. Cal. 2015)..............................................23

*Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*,
    826 F.2d 837 (9th Cir. 1987)..........................................................43

*Gelboim v. Bank of Am. Corp.*,
    No. 13–3565, 2016 WL 2956968 (2d Cir. May 23, 2016).................40

*Gilliam v. Am. Broad. Cos., Inc.*,
    538 F.2d 14 (2d Cir. 1976)..............................................................46

*Glen Holly Entm't Inc. v. Tektronix Inc.*,
    352 F.3d 367 (9th Cir. 2003).................................................... *passim*

*GoTo.com, Inc. v. Walt Disney Co.*,
    202 F.3d 1199 (9th Cir. 2000)........................................................48

*Hasbrouck v. Texaco, Inc.*,
    842 F.2d 1034 (9th Cir. 1988)........................................................34

*Homeland Housewares, LLC v. Euro-Pro Operating LLC*,
    No. 14–03954, 2014 WL 6892141 (C.D. Cal. Nov. 5, 2014)............43

*Hosp. Bldg. Co. v. Trustees of Rex Hosp.*,
    425 U.S. 738 (1976)......................................................................38

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
    125 F.3d 1195 (9th Cir. 1997)............................................... 21, 22

*In re Estate of Young*,
    160 Cal. App. 4th 62 (2008)...........................................................36

*In re Google Inc. Cookie Placement Consumer Privacy Litig.*,
    806 F.3d 125 (3d Cir. 2015)...........................................................38

*In re Stac Elecs. Sec. Litig.*,
    89 F.3d 1399 (9th Cir. 1996)..........................................................43

*In re Tobacco II Cases*,
    46 Cal. 4th 298 (2009)...................................................................50

*Indus. Bldg. Materials, Inc. v. Interchemical Corp.*,
    437 F.2d 1336 (9th Cir. 1971)........................................................34

*Inwood Labs. v. Ives Labs.*,
    456 U.S. 844 (1982)......................................................................44

*K & N Eng'g, Inc. v. Spectre Performance*,
    No. 09-1900, 2011 WL 4387094 (C.D. Cal. Sept. 20, 2011) ............44

*Kendall v. Visa U.S.A., Inc.*,
    518 F.3d 1042 (9th Cir. 2008)................................................. 18, 42

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
    232 F.3d 979 (9th Cir. 2000)..........................................................28

*Korea Kumho Petrochemical v. Flexsys Am. LP*,
  No. 07–1057, 2008 WL 686834 (N.D. Cal. Mar. 11, 2008) ..............................52
*Kwikset Corp. v. Superior Court*,
  51 Cal. 4th 310 (2011) .................................................................... 50, 51
*Laidlaw Acquisition Corp. v. Mayflower Group, Inc.*,
  636 F. Supp. 1513 (S.D. Ind. 1986) ........................................... 17, 35
*Lamothe v. Atl. Recording Corp.*,
  847 F.2d 1403 (9th Cir. 1988) ...................................................46
*Lazar v. Superior Court*,
  12 Cal. 4th 631 (1996) ................................................................36
*LePage's Inc. v. 3M*,
  324 F.3d 141 (3d Cir. 2003) .......................................................22
*Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*,
  884 F.2d 504 (9th Cir. 1989) ......................................................34
*LiveUniverse, Inc. v. MySpace, Inc.*,
  304 F. App'x 554 (9th Cir. 2008)........................................... 26, 27
*Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*,
  140 F.3d 1228 (9th Cir. 1998) ....................................................16
*Lucas v. Dep't of Corrections*,
  66 F.3d 245 (9th Cir. 1995) ........................................................27
*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ....................................................................40
*Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*,
  334 U.S. 219 (1948) ....................................................................34
*Movie 1 & 2 v. United Artists Commc'ns, Inc.*,
  909 F.2d 1245 (9th Cir. 1990) ............................................ 37, 39
*Multi Time Machine, Inc. v. Amazon.com, Inc.*,
  804 F.3d 930 (9th Cir. 2015) ........................................ 42, 47, 48
*Nat'l Ass'n of Pharm. Mfrs., Inc. v. Ayerst Labs.*,
  850 F.2d 904 (2d Cir. 1988) .......................................................36
*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents*,
  468 U.S. 85 (1984) ......................................................................29
*Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*,
  638 F.3d 1137 (9th Cir. 2011) ....................................................47
*Newcal Indus., Inc. v. Ikon Office Solution*,
  513 F.3d 1038 (9th Cir. 2008) ............................................ 37, 39, 42
*Oltz v. St. Peter's Cmty. Hosp.*,
  861 F.2d 1440 (9th Cir. 1988) ....................................................34
*Orchard Supply Hardware LLC v. Home Depot USA, Inc.*,
  967 F. Supp. 2d 1347 (N.D. Cal. 2013)......................................43

*Osborn v. Visa Inc.*,
　797 F.3d 1057 (D.C. Cir. 2015) ........................................................40

*Ostrofe v. H.S. Crocker Co.*,
　740 F.2d 739 (9th Cir. 1984) ............................................................34

*Phillips v. Cty. of Allegheny*,
　515 F.3d 224 (3d Cir. 2008) ..............................................................38

*Pinhas v. Summit Health, Ltd.*,
　894 F.2d 1024 (9th Cir. 1990) ..................................................... 34, 37

*Playboy Enters., Inc. v. Netscape Commc'ns Corp.*,
　354 F.3d 1020 (9th Cir. 2004) ...........................................................50

*ProMedica Health Sys., Inc. v. F.T.C.*,
　749 F.3d 559 (6th Cir. 2014) ...................................................... 17, 35

*Pulaski & Middleman, LLC v. Google, Inc.*,
　802 F.3d 979 (9th Cir. 2015) ....................................................... 25, 51

*R.C. Bigelow, Inc. v. Unilever N.V.*,
　867 F.2d 102 (2d Cir. 1989) ..............................................................20

*Rebel Oil Co. v. Atl. Richfield Co.*,
　51 F.3d 1421 (9th Cir. 1995) ................................................. 29, 30, 31

*Reiter v. Sonotone Corp.*,
　442 U.S. 330 (1979) ..........................................................................28

*Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*,
　No. 12–CV–05847, 2013 WL 3242245 (N.D. Cal. June 25, 2013) ....................23

*Rich v. RCA Corp.*,
　390 F. Supp. 530 (S.D.N.Y. 1975) .....................................................46

*Rowe v. Educ. Credit Mgmt. Corp.*,
　559 F.3d 1028 (9th Cir. 2009) ...........................................................39

*Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*,
　778 F.3d 775 (9th Cir. 2015) ..................................................... 16, 34, 35

*Six West Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*,
　No. 97–5499, 2000 WL 264295 (S.D.N.Y. Mar. 9, 2000) .................................20

*Skil Corp. v. Rockwell Int'l Corp.*,
　375 F. Supp. 777 (N.D. Ill. 1974) .......................................................46

*Southland Sod Farms v. Stover Seed Co.*,
　108 F.3d 1134 (9th Cir. 1997) ..................................................... 44, 47

*Sprint Nextel Corp. v. AT &T Inc.*,
　821 F. Supp. 2d 308 (D.D.C. 2011) ...................................................20

*Starr v. Baca*,
　652 F.3d 1202 (9th Cir. 2011) ..................................................... 19, 39

*Stearns v. Ticketmaster Corp.*,
　655 F.3d 1013 (9th Cir. 2011) ...........................................................51

*Sullivan v. Nat'l Football League*,
    34 F.3d 1091 (1st Cir. 1994) ............................................................29

*Summit Health, Ltd. v. Pinhas*,
    500 U.S. 322 (1991) .........................................................................15

*Sun Microsystems, Inc. v. Microsoft Corp.*,
    87 F. Supp. 2d 992 (N.D. Cal. 2000).................................................51

*Tampa Elec. Co. v. Nashville Coal Co.*,
    365 U.S. 320 (1961) .........................................................................23

*Tasty Baking Co. v. Ralston Purina, Inc.*,
    653 F. Supp. 1250 (E.D. Pa. 1987)......................................... 17, 20, 35

*Theme Promotions, Inc. v. News Am. Mktg. FSI*,
    546 F.3d 991 (9th Cir. 2008) ......................................................29, 32

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) ............................................................39

*TruePosition, Inc. v. LM Ericsson Tel. Co.*,
    No. 11-4574, 2012 WL 3584626 (E.D. Pa. Aug. 21. 2012) ...............38

*TYR Sport Inc. v. Warnaco Swimwear Inc.*,
    679 F. Supp. 2d 1120 (C.D. Cal. 2009).........................................29, 42

*U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*,
    898 F.2d 914 (3d Cir. 1990) ............................................................44

*United States v. Bazaarvoice, Inc.*,
    No. 13–cv–00133, 2014 WL 203966 (N.D. Cal. Jan. 8, 2014)...........17, 35

*United States v. Dentsply Int'l, Inc.*,
    399 F.3d 181 (3d Cir. 2005) ............................................................23

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001).............................................................23

*United States v. Phila. Nat'l Bank*,
    374 U.S. 321 (1963) ...................................................................17, 35

*Vess v. Ciba-Geigy Corp. USA*,
    317 F.3d 1097 (9th Cir. 2003).........................................................51

*Vidal Sassoon, Inc. v. Bristol-Myers Co.*,
    661 F.2d 272 (2d Cir. 1981) ............................................................44

*Vogelsang v. Wolpert*,
    227 Cal. App. 2d 102 (1964) ...........................................................36

*W. Penn Allegheny Health Sys., Inc. v. UPMC*,
    627 F.3d 85 (3d Cir. 2010) ....................................................24, 34, 38

*Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*
    648 F.3d 452 (6th Cir. 2011) ...........................................................39

*Wells Fargo & Co. v ABD Ins. & Fin. Servs., Inc.*,
    758 F.3d 1069 (9th Cir. 2014) .........................................................47

*William H. Morris Co. v. Grp. W, Inc.*,
   66 F.3d 255 (9th Cir. 1995) ............................................................ 44, 47

*William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*,
   668 F.2d 1014 (9th Cir. 1981) ...................................................................31

*Williams v. Gerber Prods. Co.*,
   552 F.3d 934 (9th Cir. 2008) ...................................................................47

*Yamauchi v. Cotterman*,
   84 F. Supp. 3d 993 (N.D. Cal. 2015) ......................................................36

*Yellow Pages Cost Consultants, Inc. v. GTE Directories Corp.*,
   951 F.2d 1158 (9th Cir. 1991) ............................................................ 33, 34

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
   395 U.S. 100 (1969) ...............................................................................16

*ZF Meritor, LLC v. Eaton Corp.*,
   696 F.3d 254 (3d Cir. 2012) ...................................................................23

## Statutes

15 U.S.C. § 18 .........................................................................................15
28 U.S.C. § 1291 .......................................................................................3
28 U.S.C. § 1331 .......................................................................................3
28 U.S.C. § 1367 .......................................................................................3
Cal. Bus. & Prof. Code § 17200 ........................................................2, 50

## Rules

Fed. R. App. P. 4(a) ..................................................................................3
Fed. R. Civ. P. 9(b) ........................................................................... 43, 51
Fed. R. App. P. 32.1 .................................................................................27
9th Cir. R. 36-3 ........................................................................................27

## Other

U.S. Dep't of Justice & Fed. Trade Comm'n,
   Horizontal Merger Guidelines (Aug. 19, 2010) ........................................... *passim*

## Preliminary Statement

Monopolists cannot resort to anticompetitive tactics to exclude smaller rivals and harm consumer welfare.  The parties in this case are competitors in the business of factoring structured settlement payment rights; they buy the right to receive scheduled future payments from settlement recipients who do not wish to or cannot wait years for their annuitized payments.  Pursuant to a scheme to acquire monopsony power in this defined relevant market, JG Wentworth ("JGW") acquired its primary competitor Peachtree, thereby achieving a 75% market share.  JGW and Peachtree, post-merger, distort the market by using an array of brands to purposefully deceive and conceal from the public their single entity status in order to maintain, preserve, and exploit their monopsony power and foreclose smaller competitors including Appellant Novation Ventures, LLC ("Novation") from the market.  This false illusion of choice forecloses competition, injures consumers, reduces output and choice, and suppresses the competitive process in violation of the antitrust laws.

Novation alleges facts plausibly satisfying the antitrust injury element under section 7 of the Clayton Act and section 2 of the Sherman Act.  The district court's dismissal at the pleading stage on this ground is reversible error.  Similarly, these facts state claims for false advertising in violation of section 43(a) of the Lanham

Act and unfair competition in violation of section 17200 of the California Business and Professions Code ("UCL").

Significantly, several antitrust elements are not at issue: (1) monopoly power; (2) relevant market; (3) dangerous probability of monopolization; and (4) specific intent to monopolize. Defendants' monopsony power is not at issue; Defendants conceded that the operative complaint properly alleges relevant market and alleges that JGW is the dominant entity with a post-merger share of 75% in a market that offers the protection of entry barriers. Neither did Defendants dispute that the pleadings allege a dangerous probability of monopolization and a specific intent to monopolize. Nor did they dispute that the complaint alleges that Defendants' deception (to courts, consumers, and Google) prevents Novation from competing on a level playing field. Defendants did not dispute that the complaint alleges conduct that violates Google's "double-serving" policy and constitutes "abuse of the [Google] ad network." Defendants did not dispute that the complaint alleges an absence of public pricing information in privately-negotiated structured settlement factoring transactions, which enables Defendants to exploit their monopsony power to the detriment of consumers, Novation, and the competitive process.

The only question with respect to the sufficiency of the pleadings is whether these detailed allegations plausibly allege antitrust injury to Novation or

sufficiently allege a claim by Novation under the Lanham Act or California's UCL.

## Jurisdictional Statement

The district court had subject matter jurisdiction of the antitrust and Lanham Act claims pursuant to federal question jurisdiction, 28 U.S.C. § 1331, and supplemental jurisdiction of the California UCL claim pursuant to 28 U.S.C. § 1367. This Court's jurisdiction rests on 28 U.S.C. § 1291.

On February 10, 2016, the district court entered judgment disposing of all claims after granting Defendants' motion to dismiss. ER19. On February 23, 2016, Novation filed a timely Notice of Appeal (ER16). Fed. R. App. P. 4(a).

## Issues Presented

This appeal presents the following issues:

1.     Did the district court err in concluding antitrust injury was not alleged where the complaint alleges (a) the top two competitors merged to establish a 75% market share (b) followed by that monopsonist's exclusionary conduct causing substantial foreclosure of competitors, supracompetitive pricing, harm to consumer welfare, reduced choice and output, and deprivation of the vigor and benefit of true competition?

2.     Did the district court err by concluding that no reasonable factfinder could find a likelihood of confusion in violation of the Lanham Act?

3.     Do these facts state a claim under the UCL?

### A. The parties compete to buy future payments from settlement recipients.

Since 2001, Novation has been engaged in the business of purchasing structured settlement payment receivables by buying the right to receive scheduled future payments from individual settlement recipients who do not wish to or cannot wait years for their annuitized payments. ER65 ¶ 6, ER73 ¶ 32. JGW is the largest participant, with about 75% of the U.S. structured settlement purchasing market. ER65 ¶ 7. Prior to JGW's acquisition of Peachtree in August 2011, JGW and Peachtree had been the top two competitors, respectively funding 40-45% and 30% of the structured settlement factoring transactions completed in the United States annually. ER66 ¶ 11. Novation was one of the first companies to compete vigorously against JGW and Peachtree, doing so with marked success from 2001 until at least 2011 (when JGW and Peachtree merged). ER73 ¶ 32. While a stringent regulatory scheme acts a barrier to entry (ER69 ¶ 19), Novation was well able to compete subject to this stringent regulatory scheme prior to Defendants' merger and anticompetitive scheme. ER73 ¶ 32. Novation is one of only a small number of established competitors (ER72 ¶ 27), not a "new" entrant, and had no

---

[1] The facts are recited in the district court's orders dated February 1, 2016 (ER1–4), September 21, 2015 (ER111–114), and May 18, 2015 (ER161–163).

trouble operating (and indeed flourishing) under the state and federal regime which has prevailed since at least 2001. ER73–74 ¶ 32.

The relevant market for antitrust purposes is the purchasing of structured settlement payment receivables from individual sellers in the United States. ER68–69 ¶¶ 16–18. In structured settlement factoring, a small number of specialized businesses in a highly concentrated market buy structured settlement payment rights from individual sellers. ER69 ¶ 17, ER73 ¶¶ 30–31. These companies compete against each other for on-screen shelf space and position in pay-per-click internet advertising. ER66 ¶ 11. In any given transaction, the structured settlement factoring entity is buying (paying cash for) a specific set of structured settlement payment rights offered for sale by a given individual seller. ER69 ¶ 17. Individuals seeking to sell their structured settlement payment rights for "upfront" cash must find one of the handful of national structured settlement purchasers serving this niche market. ER72 ¶¶ 27–28, ER74 ¶ 33.

**B.      JGW acquired its primary competitor Peachtree and enjoys monopsony power but deceptively markets commonly-owned-and-operated brands as competing entities.**

Prior to 2011, the structured settlement industry was robust and competitive. ER90 ¶ 93. JGW was the largest competitor, with nearly half the market; Peachtree was close behind, with nearly one-third. ER90 ¶ 93. Other smaller entrants, including Novation, were able to engage their larger rivals in direct

competition for consumer transactions. ER90–91 ¶ 93. Equally or more important, sellers were able freely to seek competitive offerings and ensure they were getting a fair and reasonable deal. ER90–91 ¶ 93.

Pursuant to a scheme to acquire monopsony power in this defined relevant market, JGW acquired its primary competitor Peachtree, thereby achieving a 75% market share. ER66–68 ¶¶ 11–15. JGW secured approval to acquire Peachtree by representing that the process by which competing companies had bid against one another to purchase structured settlement cash flows from individual sellers would continue and would serve to protect consumers; but then, post-merger, proceeded to systematically corrupt and frustrate that competitive bidding process. ER67 ¶ 12.

JGW, Peachtree, and Olive Branch Funding are brands that present themselves to the public as competing purchasers of structured settlement payment rights, but which all operate under JGW's ownership, control, and management, where all branding, advertising, marketing, product offerings, and transaction pricing are controlled by JGW at the same business address. ER65–68 ¶¶ 7–14. JGW advertises and presents itself to the public using (at least) three distinct brand names, all under common ownership and control – a fact not clearly revealed or disclosed in the brands' consumer facing websites, TV advertising, or print materials. ER67 ¶ 14.

JGW controls and coordinates what JGW says (and doesn't say) in each of its various brand guises; where, how, and when it uses each of those brand names in its advertising and communications with actual and prospective structured settlement sellers; what each JGW-controlled brand tells (or doesn't tell) prospective individual sellers about the value of their structured settlement payments rights or about any offer or price that any other JGW-controlled brand may have made to the same individual for those payments; what branded ad Google is paid to display, in which search result position, when an individual seller types any given search term into a desktop or mobile Internet browser; and what price(s) a JGW-controlled brand offers to any individual seller for any given set of structured settlement payment rights in each of its brand guises. ER67–68 ¶ 14. By concealing their status as a single entity, JGW, Peachtree, and Olive Branch unfairly distort the bargaining process. ER70–71 ¶ 23.

JGW, Peachtree, and Olive Branch customer databases and telephone systems are co-located and commonly owned and controlled. ER89 ¶ 89. If an individual seller who has contacted JGW seeks a second bid and contacts (or accepts a call from) JGW in the guise of either its Peachtree or Olive Branch brands, the customer's phone number is recognized by Peachtree's phone system. ER89 ¶ 89. Neither Peachtree nor JGW nor Olive Branch will advise the customer of the common ownership and control and each will take the customer's time and

information and purport to offer price quotes as if they were two competing companies, bidding against one another when in truth the bidding process is illusory. ER89 ¶ 89.

### C. Post-merger, JGW systematically engages in anticompetitive conduct that harms competition, consumers, and competitors.

As discussed, JGW and Peachtree, post-merger, distort the market by using an array of brands to purposefully deceive and conceal from the public their single entity status in order to maintain, preserve, and exploit their monopsony and foreclose smaller competitors including Novation from the market. ER77–90 ¶¶ 48–92.

JGW knows that transactions negotiated free from actual competition will yield monopsony profits and knows that individual sellers routinely use the internet to look for competing bids. ER79 ¶ 54. JGW also knows that most sellers who have invested time obtaining bids from two companies will not solicit a third bid. ER85–86 ¶¶ 78–79. Therefore, JGW uses an array of brand names designed to appear to individual sellers as separate and independent companies, and promotes that fleet of fake brands to decrease the likelihood that its prospective customers will find a genuinely competing bid. ER77–78 ¶¶ 48–49. This distortion of the competitive process is what injures Novation (ER93 ¶¶ 102–104) and other competitors (ER94 ¶ 105) and harms consumer welfare (ER82 ¶¶ 62–64).

**1.     Structured settlement factoring transactions are individualized and privately negotiated.**

JGW (through its fleet of alter egos) is in the business of *buying* (not selling) specific sellers' structured settlement payments.  ER92 ¶ 98.  The only substantive "quality" differentiating the competing bidders is the amount of money each is offering to buy the thing being sold.  ER92 ¶ 98.  Sellers do not advertise their settlement payments for sale (ER74 ¶ 35); nor do structured settlement companies offer or advertise pricing online (ER77 ¶ 47).  If sellers wish to "shop" for the best price (because pricing is negotiated, private, and neither standardized nor posted), they must find a bona fide competing bidder.  ER74 ¶ 33.  The price sellers are able to negotiate for their settlement payments is most heavily influenced by whether or not they have "shopped" among competing purchasers and received genuinely competitive bids from them.  ER70 ¶ 22.

What is bought and sold is different in each transaction.  ER70 ¶ 22.  There are no posted or standard prices or reference rates published or available to sellers ER70 ¶ 22); information about one seller's transaction cannot and does not influence the pricing secured by another seller in a different negotiation (ER70–71 ¶ 23).  Pricing in each transaction is the result of private "negotiation" between the individual seller and factoring company buying the payments.  ER70 ¶ 22.  Two otherwise identical sellers, with otherwise identical streams of settlement payments to sell, routinely receive vastly different prices from JGW (or its alter egos)

depending on whether JGW learns that the prospective seller is entertaining a bid for those same payments from a bona fide competitor (and not merely a JGW alter ego). ER70 ¶ 22.

In each petition to approve a proposed transfer of structured settlement payment rights, a superior court judge is asked to find that the proposed transaction is "fair" and in the individual seller's "best interests." ER71 ¶ 25. The court approval process is not a sufficient safeguard to prevent harm to consumers stemming from a subversion of the bidding process through the use of shills and alter egos. ER72 ¶ 26. State courts may take some false comfort in seeing that some sellers choose JGW, others appear to choose Peachtree or Olive Branch; but courts and consumers are not told that JGW and Peachtree and Oliver Branch are one and the same: commonly owned and controlled; they pretend to (but do not actually) compete. ER71 ¶ 25. The court approval process was never designed to substitute for the price discipline of genuine marketplace bidding. ER72 ¶ 26. Indeed, the court review and approval process assumes that the seller has come to court seeking approval after weighing and considering genuinely competing bids and alternatives. ER72 ¶ 26. The state courts, in reviewing these transactions, do not (and cannot) conduct independent price comparisons or organize auctions on behalf of sellers; the courts' findings are necessarily limited to the procedure set

forth in the applicable state "structured settlement transfer" statute – which does not contemplate a court-supervised auction.  ER72 ¶ 26.

## 2. Sellers typically seek two competing bids online.

Sellers typically search online using Google's internet search engine, and the majority of searches are conducted on a mobile phone, where only the top two or three search results or paid listings are visible on the small screen.  ER74–92 ¶¶ 36–43, 48, 54, 100.  To obtain specific pricing information, prospective sellers must speak to a buyer's representative, during which the settlement buyer gathers information about the seller, the settlement, the amounts and schedule of payments, the name of the annuity company making payments, whether the individual seller has sold payments before; and what the transaction is intended to fund.  ER77 ¶ 47.  At the same time, the court review process is explained to the seller.  ER77 ¶ 47.  Such a conversation can take hours.  ER77 ¶ 47.  Once sellers have invested the time in conveying information to and obtaining bids from at least two companies they believe to be competing, relatively few individual sellers will search for and solicit a third or fourth bid.  ER77–78 ¶ 48.

The vast majority of consumers do not scroll beyond the first page of search results or are tricked by Defendants into not doing so.  ER74–76 ¶¶ 36–43.  Indeed, published industry statistics suggest that 95% of the traffic to websites from search engines come from listings appearing on the first page of the search results.

ER74–75 ¶ 36.  About 1/3 stay with the top listing only and go no further.  ER75 ¶ 37.

### 3. JGW manipulates market conditions to exclude competition, thwart sellers' efforts to obtain competing bids, and maximize monopsony profits.

JGW is well aware of the strategic importance of the top three paid search listings.  ER75–80 ¶ 37, 49–55.  Most sellers do try to shop for competing bids (ER74 ¶ 34) and, as Defendants concede, will scroll through search results until they think they've found one or more competing offers.  ER92 ¶ 100.  But it stands to reason that sellers will stop shopping (and stop scrolling) once they believe they've found a competing bidder or two.  ER82–86 ¶¶ 66–79.  That is exactly the consumer behavior that Defendants' branding deception exploits: Defendants use multiple brands to trick sellers to stop shopping.  JGW (through its fleet of alter egos) tries to buy a specific thing from a customer free from competition by orchestrating the false appearance of competition.  JGW's behavior is akin to a team of shills showing up to pretend to bid against one another as a hapless individual seeks to sell one specific item online for the highest possible price.  ER92–93 ¶¶ 98–101.

The rewards that JGW (dba JGW, Peachtree, or Olive Branch) can reap from keeping actual and prospective sellers from ever finding a genuine alternative bid far outstrip the rewards other purchasers (such as Novation) can hope to earn in

offering those same sellers a competitive bid.  ER78 ¶ 51.  JGW spends its

marketing dollars supporting three brands, simultaneously chasing the same

individual sellers in an effort to buy the same thing from him or her.  ER97–99 ¶¶

119–129.  As a consequence of its ongoing misrepresentations and deception, JGW

(using at least these three brands simultaneously) is able to systematically and

deceptively bid more than its competitors for more of the limited "paid search" ad

slots.  ER78–80 ¶¶ 49–55.  In contrast, a settlement purchasing business that does

not utilize decoys and shill bidders cannot rationally bid a premium to attract

business.  ER79 ¶ 52.

Since JGW's August 2011 acquisition of Peachtree, JGW and its

subsidiaries have paid Google $10–20 million in pay-per-click fees to direct

internet users to websites and/or phone numbers managed and controlled by JGW

brands including "JG Wentworth" and "Olive Branch" and "Peachtree."  ER79–80

¶ 55.  Armed with market power through its unlawful acquisition, JGW exploits

that undue concentration of market power and the lack of pricing transparency and

information available to sellers by consciously and deliberately suppressing the

competitive process through the use of shill and decoy brands.  ER87–90 ¶¶ 82–

92.  A single entity masquerading as competitive bidders taking up the top spots is

anticompetitive, constitutes "abuse of the ad network," and violates Google's

policy against double-serving, which prohibits affiliated advertisers from bidding

to buy more than one search result to be displayed in response to any given search query. ER80–81 ¶¶ 56–59. Indeed, if dominating the top paid search results with apparently different brands didn't work to crowd out competition and keep customers from finding genuinely competing bids, Defendants wouldn't have spent millions trying to do just that. *See* ER77–80 ¶¶ 47–55. Other factoring companies that comprise the small market share not taken by JGW or Peachtree have been similarly harmed and will corroborate Novation's allegations. ER94 ¶ 105.

### Procedural Background

On February 10, 2015, Novation filed its complaint alleging violations of the antitrust laws. ER173–186. Defendants moved to dismiss (ER195–196), and the district court granted their motion with leave to amend on May 18, 2015 (ER161–172). Novation filed a first amended complaint, adding claims under the Lanham Act and UCL. ER126–160. Defendants again moved to dismiss (ER194), and the district court entered its order on September 21, 2015 (ER111–125), again allowing Novation leave to amend. Novation filed its second amended complaint, alleging violations of (1) section 7 of the Clayton Act; (2) section 2 of the Sherman Act; (3) section 43(a) of the Lanham Act; and (4) California Business & Professions Codes section 17200. ER63–110. After hearing argument from counsel on Defendants' motion to dismiss (ER20–41), the district court granted Defendants' motion to dismiss with prejudice on February 1, 2016 (ER1–15).

On February 10, 2016, judgment was entered in favor of Defendants. ER18–19. On February 23, 2016, Novation filed a timely notice of appeal. ER16–17.

## Summary of Argument

This case challenges whether an entity in a defined relevant market may first acquire its largest competitor, giving it approximately 75% of the market (monopsony power), and then abuse that dominance by knowingly and deceptively leading consumers to believe its multiple operating entities offer separately competing bids – when they, in truth, do not – to injure competition, competitors, and consumers. At issue is whether the complaint alleges antitrust injury and a likelihood of confusion. It does.

At the pleading stage, JGW cannot credibly challenge its monopsony power or that "the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly" in violation of section 7.[2] Pursuant to the Clayton Act's incipiency standard, section 7 prohibits mergers where injury is only

---

[2] *See* 15 U.S.C. § 18; *Brown Shoe Co. v. United States*, 370 U.S. 294, 317 (1962) ("Congress saw the process of concentration in American business as a dynamic force; it sought to ensure . . . courts the power to brake this force . . . before it gathered momentum"); *cf. Summit Health, Ltd. v. Pinhas*, 500 U.S. 322, 330 (1991) ("proper analysis focuses, not upon actual consequences, but rather upon the potential harm that would ensue"); *see generally* U.S. Dep't of Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines §§ 2–6, 12 (Aug. 19, 2010), *at* http://www.justice.gov/atr/public/guidelines/hmg-2010.pdf.

threatened.[3]  "'There can be little doubt that the acquisition of the second largest firm in the market by the largest firm in the market will tend to harm competition in that market.'"[4]

In this highly concentrated industry, such further consolidation between the #1 and #2 competitors should be presumed anticompetitive on its face.[5]  Novation further alleges that JGW's anticompetitive conduct suppresses competition, harms consumers with increased prices and reduced choice, and forecloses Novation and similarly aggrieved smaller competitors from effectively competing on a level playing field.  These are plausible antitrust injury allegations.[6]

---

[3] *Cal. v. Am. Stores Co.*, 495 U.S. 271, 282 n.8 (1990); *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130 (1969); *Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1234–37 (9th Cir. 1998) (Tashima, J.).

[4] *F.T.C. v. Staples, Inc.*, No. 15–2115, [Redacted] Order Granting Preliminary Injunction, ECF No. 455 at 74 (D.D.C. May 17, 2016) (quoting *F.T.C. v. Sysco Corp.*, 113 F. Supp. 3d 1, 66 (D.D.C. 2015) and *F.T.C. v. Whole Foods Market, Inc.*, 548 F.3d 1028, 1043 (D.C. Cir. 2008); *see* Merger Guidelines § 6 ("The elimination of competition between two firms that results from their merger may alone constitute a substantial lessening of competition.").

[5] *F.T.C. v. H.J. Heinz Co.*, 246 F.3d 708, 713–19 (D.C. Cir. 2001); *F.T.C. v. Swedish Match*, 131 F. Supp. 2d 151, 166 (D.D.C. 2000); *F.T.C. v. Staples, Inc.*, 970 F. Supp. 1066, 1083 (D.D.C. 1997); Merger Guidelines § 1, at p. 2 ("[M]ergers should not be permitted to create, enhance, or entrench market power or to facilitate its exercise. . . A merger enhances market power if it is likely to encourage one or more firms to raise price, reduce output, diminish innovation, or otherwise harm customers as a result of diminished competitive constraints or incentives.").

[6] *See, e.g., Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 783–92 (9th Cir. 2015) (striking down acquisition of state's largest physician practice group after competitors complained about anticompetitive

Initially, JGW argued that a competitor subject to a horizontal merger suffered no antitrust injury because the reduction in competition actually benefited that competitor by reducing the number of competitors and enabling all competitors to raise prices. But a competitor only realizes that benefit if the acquisition actually eliminates the acquired company from the competitive infrastructure. In fact, JGW did not take Peachtree out of the market, but instead maintained and exploited the market presence of the acquired company and former competitor by concealing the ownership relationship and manipulating market forces with deceptive bidding and marketing activity. Moreover, the private nature of structured settlement factoring transactions ensures that Defendants alone (as JGW, Peachtree, or Olive Branch) enjoy increased profits from transactions undisciplined by true price competition while competitors' transactions remain restrained by market forces.

Effectively conceding that such conduct does not benefit competition, JGW next argued that the anticompetitive conduct only has a *de minimis* effect on

nature of sale); *Am. Stores*, 495 U.S. at 284 ("clear intent to encourage vigorous private litigation against anticompetitive mergers"); *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 364–65 (1963); *Brown Shoe*, 370 U.S. at 342–46; *Heinz*, 246 F.3d at 716; *ProMedica Health Sys., Inc. v. F.T.C.*, 749 F.3d 559, 564–73 (6th Cir. 2014); *AlliedSignal, Inc. v. B.F. Goodrich Co.*, 183 F.3d 568, 574–76 (7th Cir. 1999); *Tasty Baking Co. v. Ralston Purina, Inc.*, 653 F. Supp. 1250, 1255 (E.D. Pa. 1987); *Laidlaw Acquisition Corp. v. Mayflower Group, Inc.*, 636 F. Supp. 1513, 1516 (S.D. Ind. 1986); *United States v. Bazaarvoice, Inc.*, No. 13–cv–00133, 2014 WL 203966, at *64–76 (N.D. Cal. Jan. 8, 2014); *see also* Merger Guidelines § 5.3, at pp. 18–19.

competition.  However, such a blatant rejection of Novation's allegations and inferences favorable to JGW are not proper at the pleading stage.  JGW can raise such arguments – based on evidence – to defeat summary judgment.  At the pleading stage, JGW's deceptive conduct as alleged is presumptively anticompetitive because its helps preserve, extend, and exploit a monopsonist's market power.  Accordingly, Novation plausibly alleges antitrust injury and JGW's acquisition of Peachtree and subsequent duplicitous conduct should be subject to the full scope of section 7 and section 2 scrutiny.

In sum, JGW (45% market share) acquired Peachtree (30% market share) to (1) eliminate its main rival as a competitor and (2) produce a market share with monopsony numbers, and (3) abuses that monopsony power to engage in anticompetitive, exclusionary conduct.   Novation's challenge of JGW's acquisition of Peachtree and post-merger anticompetitive acts of deceiving sellers to believe they are shopping among brands that appear to (but do not actually) compete with one another sufficiently states a claim under section 7 of the Clayton Act and section 2 of the Sherman Act.  For the same reasons, dismissal of the Lanham Act and UCL claims should be reversed.

### Standard of Review

This Court reviews the grant of a motion to dismiss *de novo*.  *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1046 (9th Cir. 2008).  Denial of leave to amend based

on futility is similarly reviewed *de novo*. *Panthers Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 119 (2d Cir. 2012). "All allegations of material fact in the complaint are regarded as true and construed in the light most favorable" to Novation. *Glen Holly Entm't Inc. v. Tektronix Inc.*, 343 F.3d 1000, 1010 (9th Cir.), *amended on denial of reh'g*, 352 F.3d 367, 374 (9th Cir. 2003). "The standard at this stage of the litigation is not that plaintiff's explanation must be true or even probable." *Starr v. Baca,* 652 F.3d 1202, 1216–17 (9th Cir. 2011). "If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." *Id.* at 1216. "The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012).

## Argument

### I.     Novation plausibly alleges antitrust injury.

After setting forth the correct antitrust injury standard (ER8, 10), the district court misapplied the standard and erroneously and prematurely concluded at the pleading stage that Novation's allegations of foreclosure, consumer harm, reduced choice, and deprivation of the vigor and benefit of true competition were implausible. ER8–11.

Antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 484, 489 (1977) (deciding "narrow" issue of "only whether antitrust damages are available where the sole injury alleged is that competitors were continued in business, thereby denying respondents an anticipated increase in market shares"); *see also Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1054–58 (9th Cir. 1999) (four requirements include: "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent").

Novation plausibly alleges that JGW's coordinated bidding and deceptive marketing activity, enabled by its monopsony power, suppresses market forces and impairs the ability of genuine competitors (such as Novation) to compete – placing Novation and other competitors at a severe competitive disadvantage and preventing sellers from soliciting genuine competing bids.[7]

---

[7] *See, e.g., Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 478 (1992); *R.C. Bigelow, Inc. v. Unilever N.V.*, 867 F.2d 102, 107–11 (2d Cir. 1989); *Sprint Nextel Corp. v. AT &T Inc.*, 821 F. Supp. 2d 308, 327 (D.D.C. 2011); *Bon-Ton Stores, Inc. v. May Dep't Stores Co.*, 881 F. Supp. 860, 878 (W.D.N.Y. 1994); *Tasty Baking*, 653 F. Supp. at 1274–76; *Six West Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*, No. 97–5499, 2000 WL 264295, at *21–29 (S.D.N.Y. Mar. 9, 2000).

Specifically, Novation alleges that (a) Novation is an immediate target of JGW's anticompetitive conduct and Novation's injuries are a necessary step to JGW achieving, maintaining, and exploiting its monopsony power; (b) JGW has succeeded in purchasing structured settlement cash flows at artificially low prices by excluding Novation from competing on a level playing field—reducing competition and injuring sellers in the market, and (c) Novation's injuries, such as the loss of revenues it would have earned but for JGW's post-merger monopsonizing conduct, are a direct consequence of Novation's substantial foreclosure from the relevant market. These are plausible antitrust injury allegations.

### A. Novation need not allege complete exclusion.

As the district court properly stated (ER10), "market foreclosure" is conduct that "is facially anticompetitive and exactly the harm that the antitrust laws aim to prevent." *Kodak*, 504 U.S. at 478. Novation alleges exclusionary conduct – acquiring monopsony power enabling the use of deception to create a false illusion of competition – which "unnecessarily excludes or handicaps competitors" (*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 597 (1985)) and "impairs the efforts of others to compete for customers in an unnecessarily restrictive way" (*Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1211 n.6 (9th Cir. 1997)). Spending millions of dollars on marketing that is

specifically designed to trick potential sellers into thinking that they have

discovered an alternative buyer (when they, in fact, have not) is conduct that keeps

significant numbers of sellers from ever finding a genuine competing bid and is

inherently anticompetitive.  So, too, is conduct that constitutes a "deliberate effort

to discourage [a defendant's] customers from doing business with its smaller

rival."[8]  Where such exclusionary behavior is alleged, Novation has satisfied its

burden at the pleading stage.

The district court found it implausible that Defendants' alleged deception

prevents consumers from clicking on links of competitors such as Annuity (ER9).

The district court noted that a competitor of Defendants and Novation appears, at

least once, to have been successful in winning a listing along with JGW and

Peachtree when responding to the specific search inquiries "who competes with JG

Wentworth" or "who competes with Peachtree."  The district court also speculates

---

[8] *Aspen*, 472 U.S. at 610; *see Kodak*, 504 U.S. at 483–84; *Image Tech.*, 125 F.3d at 1208 ("'to foreclose competition, to gain a competitive advantage, or to destroy a competitor'"); *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 308 (3d Cir. 2007); *LePage's Inc. v. 3M*, 324 F.3d 141, 159 (3d Cir. 2003) ("When a monopolist's actions are designed to prevent one or more new or potential competitors from gaining a foothold in the market by exclusionary, i.e. predatory, conduct, its success in that goal is not only injurious to the potential competitor but also to competition in general."); *Conwood Co., L.P., v. United States Tobacco Co.*, 290 F.3d 768, 790–91 (6th Cir. 2002); Merger Guidelines § 1, at p. 2 ("Enhanced market power may also make it more likely that the merged entity can profitably and effectively engage in exclusionary conduct.").

that consumers may not click on an "Ad" or any of the search results and may input their own search terms. ER9. This is not the standard.

Novation need not contend that all competitors are always excluded.[9] As discussed, the Supreme Court has established that a plaintiff can prove antitrust injury before it has been eliminated from the market and before competition is lessened. Indeed, Novation "need not 'prove an actual lessening of competition in order to recover. [C]ompetitors may be able to prove antitrust injury before they actually are driven from the market and competition is thereby lessened.'" *Blue Shield of Va. v. McCready*, 457 U.S. 465, 482 (1982) (quoting *Brunswick*, 429 U.S. at 489 n.14); *see also Dentsply*, 399 F.3d at 191; *Microsoft*, 253 F.3d at 64.

Regardless, Novation alleges substantial foreclosure from the market, despite being an established genuine competitor in the market. JGW (using up to

---

[9] Typically, market foreclosure allegations are required only in section 1 exclusive dealing, vertical restraint, or tying cases. *See, e.g., Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961); *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996–98 (9th Cir. 2010); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 271 (3d Cir. 2012); *Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1030 (N.D. Cal. 2015); *Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, No. 12–CV–05847, 2013 WL 3242245, at *10 (N.D. Cal. June 25, 2013). Even then, complete foreclosure is not required; substantial foreclosure is the legal standard. *See, e.g., United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191 (3d Cir. 2005) ("it is not necessary that all competition be removed from the market. The test is not total foreclosure, but whether the challenged practices bar a substantial number of rivals or severely restrict the market's ambit."); *United States v. Microsoft Corp.*, 253 F.3d 34, 64 (D.C. Cir. 2001) (competitors need not be barred "from all means of distribution," if they are barred "from the cost-efficient ones").

three brands simultaneously) is able to bid more than its competitors for more of the limited "paid search" ad slots specifically because the rewards that JGW can reap from keeping actual and prospective sellers from finding a genuine alternative bid far outstrip the rewards other purchasers (such as Novation) can hope to earn in offering those same sellers a competitive bid. JGW pays Google to show consumers a Peachtree ad when they are seeking a competitive bid and pays Google to show a JGW or Olive Branch ad when seeking a bid that is competitive to Peachtree's bid. JGW falsely palms off Peachtree and Olive Branch as independent competitors, which crowds out actual competitors including Novation and/or artificially drives up the cost of being in second or third position in any given search ranking, making it unduly difficult and prohibitively expensive for Novation or other genuine competitors to be found by sellers looking for genuinely competing offers. ER77–80 ¶¶ 47–55. JGW does this so that when the public gets separate bids from JGW, Peachtree, or Olive Branch, sellers believe they have obtained true competitive offerings.[10] Other settlement purchasing businesses that follow the rules and do not utilize decoys and shill bidders cannot rationally sustain a consistent practice of bidding such a premium to attract business. ER78–79 ¶¶

---

[10] Defendants wish to be free from Section 1 liability as a single enterprise yet masquerade as competitors in the marketplace and seek to be immunized from Section 2 scrutiny. *See Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 190 (2010); *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768–69 (1984); *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 108–09 (3d Cir. 2010).

51–52; *see, e.g., Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 986 n.7, 989 (9th Cir. 2015) (pervasive deception based on AdWords as opposed to rational bidding). And as the district court noted, "[t]he results of a Google search are continually changing." ER115.

In simple terms, JGW engages in duplicitous conduct to maintain a public perception that JGW, Peachtree, and Olive Branch are separate competitive brands when in truth they are not. And JGW utilizes Google to facilitate this deception – leading sellers to believe that when they receive bids from Peachtree, JGW, or Olive Branch, they are shopping among competitors when, in fact, these entities are commonly owned and controlled and do not compete. ER 78–82 ¶¶ 50–58, 60, 64, 66. As a result, sellers are dissuaded from seeking further bids and deprived of market forces in seeking a competitive price. Novation and other competitors are foreclosed from reaching those potential customers. There is no other logical, business, or economic explanation for maintaining this duplicity.

Novation alleges that in the overwhelming majority of transactions, JGW entities bid free from the competitive discipline of Novation or any other genuine competitor. ER88 ¶ 86. And whenever JGW succeeds in keeping a seller from finding a genuinely competing bid; only JGW enjoys the benefit of the depressed pricing which stems from that deception. No other competitors benefit from the depressed bids in which JGW buys structured settlements in *individual, privately*

*negotiated* transactions with sellers. The "very few instances where a seller is able to find a true competitor" (ER70–71 ¶ 23) does not represent the "substantial majority of transactions" (ER77–78 ¶ 48) where sellers are unable to wade through Defendants' many shills and alter egos to find a true competitor.[11] Accordingly, JGW actively engages in deceptive conduct it knows is competition-reducing. *See, e.g.,* ER79 ¶ 52 (JGW knows it can reap more than $30,000 in profit if the transaction is kept free from competition).

The district court's reliance (ER10–11) on an unpublished, easily distinguishable decision of this Court to support its foreclosure analysis is misplaced. In *LiveUniverse, Inc. v. MySpace, Inc.*, 304 F. App'x 554, 557 (9th Cir. 2008), LiveUniverse alleged monopolization based on MySpace disabling links on MySpace.com to other social networking websites, claiming a reduction in consumers' choices in the relevant market of social networking websites, thereby diminishing "'the quality of consumers' social networking experience.'" *Id*. Because MySpace's actions affected only *its own website*, the court found those sparse allegations deficient because it was impossible for MySpace's conduct to prevent internet users from reaching LiveUniverse or other competing websites. *Id*. ("All MySpace has done is prevent consumers from accessing vidiLife.com

---

[11] ER119 ("If Plaintiff 'must "bid up" and compete on price to win deals away from' Defendants, (FAC ¶ 22), then the price that sellers of structured settlement payment rights will receive will also go up.").

*through MySpace.com*.").  LiveUniverse also failed to allege a prior voluntary
arrangement with MySpace or that any such arrangement was profitable to
MySpace.  *Id*. at 556.  In contrast here, JGW's acquisition of Peachtree alone
enabled monopoly power that JGW exploits to reduce output and choice and enjoy
monopoly profits.  Novation alleges exclusionary conduct based on Defendants'
coordinated, pervasive deceptive advertising and marketing on Google to trick
consumers into believing they are receiving competitive bids from JGW,
Peachtree, and Olive Branch and foreclosing competitors from offering genuinely
competitive bids.  In any event, *LiveUniverse* is not precedent.  *Id*. at 555 n.***;
Fed. R. App. P. 32.1; 9th Cir. R. 36-3.

The district court stated that Novation is "bound by its own broad definition
of the relevant market" and that even as to the "narrow piece" Novation "carves
out," Novation fails to plausibly allege that it cannot compete and bid for the top
ad positions.  ER11.  The district court's analysis misses the mark, disregards the
allegations and industry practice, and presumes facts favorable to JGW.  Novation
in fact alleges it (and other competitors) cannot compete on a level playing field
because JGW has manipulated market conditions to systematically crowd out the
competition.  If amendment could have cured the district court's perceived
deficiency here, leave should have been given.  *Lucas v. Dep't of Corrections,* 66
F.3d 245, 248 (9th Cir. 1995).

In sum, Novation has been crowded out by JGW's double-serving and deceptive misuse of Google AdWords, coordinated bidding, and advertising in the guise of multiple buyers pretending to offer competitive bids but which are, in fact, a single enterprise. *E.g.,* ER87–94 ¶¶ 82–105. Novation will be able to provide a statistical basis for determining the number of transactions from which it has been excluded because of JGW's multiple Google listings. ER88 ¶ 87. Similarly aggrieved smaller competitors are likewise hurt by the merger and JGW's subsequent marketplace misconduct. ER94 ¶ 105.

**B. Novation alleges antitrust injury as a result of harm to consumer welfare, reduced choice and output, and the deprivation of the benefit and vigor of true competition.**

As the district court stated:

> The Supreme Court has explained that "[t]he essence of the antitrust laws is to ensure fair price competition in an open market." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 342 (1979). The Court agrees with Plaintiff that a price increase "resulting from a dampening of competitive market forces" is one type of antitrust injury. *Blue Shield of Va. v. McCready*, 457 U.S. 465, 482 (1982) (quoting *Reiter*, 442 U.S. at 342).

ER116.

Conduct that eliminates rivals reduces competition, and invokes the Sherman Act when it harms consumer welfare. *See Reiter*, 442 U.S. at 343 ("Congress designed the Sherman Act as a 'consumer welfare prescription.'").

"Every precedent in the field makes clear that the interaction of competitive forces . . . is what will benefit consumers." *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232

F.3d 979, 988 (9th Cir. 2000).  When an entity has market power to alter prices from competitive levels, and sustain that practice for an extended period, the entity's actions threaten consumer welfare.  *See Nat'l Collegiate Athletic Ass'n v. Bd. of Regents*, 468 U.S. 85, 107 (1984) (emphasizing consumer preferences in setting output and prices); *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995); *Sullivan v. Nat'l Football League*, 34 F.3d 1091, 1101 (1st Cir. 1994).

As the district court also properly recognized (ER8): One "form of antitrust injury is '[c]oercive activity that prevents its victims from making free choices between market alternatives.'"  *Amarel v. Connell*, 102 F.3d 1494, 1509 (9th Cir. 1996) (quoting *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 528 (1983)); *accord Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1003–04 (9th Cir. 2008); *Glen Holly*, 352 F.3d at 374; *TYR Sport Inc. v. Warnaco Swimwear Inc.*, 679 F. Supp. 2d 1120, 1132 (C.D. Cal. 2009).

The Supreme Court has rejected the notion that an antitrust plaintiff's injuries must result from the *effect* of the defendants' conduct and has stated a plaintiff suffers antitrust injury when its injuries flow from an anticompetitive *aspect* of the conduct itself.  *McCready*, 457 U.S. at 482.  To be causally related to an anticompetitive aspect of the practice, a plaintiff's injuries must flow from

conduct that is harmful to competition. *See Rebel Oil*, 51 F.3d at 1433. Evidence of restricted output and supracompetitive pricing that is not responsive to consumer preferences is direct proof of injury to competition which a competitor with market power may inflict.[12]

Novation plausibly alleges that it can establish that JGW's illegal acquisition affording it control of 75% of the structured settlement market – coupled with its maintenance of that monopsony share through deceiving customers into believing they are dealing with unrelated, competing entities – diverts customers from Novation, impairs Novation's access to channels of distribution, raises JGW's rivals' costs, and reduces the vigor of the competitive process. Novation's allegations demonstrate structural evidence of a monopsonized market (concentrated market, pricing contingent on competition). Reduced output and higher prices (depressed bids) are an aspect of Defendants' anticompetitive conduct and Novation's injuries flow from the anticompetitive *aspect* of the

---

[12] *See F.T.C. v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986); *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 493 (1940) ("restrict production, raise prices or otherwise control the market to the detriment of purchasers or consumers"); *Coal. For ICANN Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d 495, 504 (9th Cir. 2010) ("Harm to consumers in the form of higher prices resulting from competitive restraints has long been held to constitute an actual injury to competition"); *Glen Holly*, 352 F.3d at 372–78; *Am. Ad Mgmt.*, *Inc. v. GTE Corp.*, 92 F.3d 781, 791 (9th Cir. 1996) ("it is difficult to image a more typical example of anti-competitive effect than higher prices"); *Rebel Oil*, 51 F.3d at 1434.

conduct.[13]  Non-price effects such as reduced service quality and increased

bargaining leverage alongside price impacts demonstrate a plausible antitrust

injury.  Given the highly concentrated nature of the industry and JGW's dominant

market power in this niche market where pricing is individually and privately

negotiated, Novation has plausibly alleged that Defendants' deceptive, duplicitous

conduct intended to deceive consumers is anticompetitive.[14]  The harm to sellers

due to JGW's monopsonistic pricing, diminished competitive forces, and restricted

choice is harm to competition flowing from the alleged anticompetitive conduct.

As a result, Novation's injuries are "attributable to an anti-competitive aspect of

the practice under scrutiny."  *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S.

328, 334 (1990).  Novation's alleged injuries are a necessary step in Defendants'

---

[13] *See F.T.C. v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986) (evidence of restricted output and artificially increased prices is direct proof of injury to competition which a competitor with market power may inflict); *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 493 (1940) ("restrict production, raise prices or otherwise control the market to the detriment of purchasers or consumers"); *Glen Holly*, 352 F.3d at 372–78; *Rebel Oil*, 51 F.3d at 1434.

[14] *See, e.g.*, *William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*, 668 F.2d 1014, 1030–31 (9th Cir. 1981) ("Such conduct is not true competition…Its purpose is to create a monopoly by means other than fair competition."); *Conwood Co., L.P., v. United States Tobacco Co.*, 290 F.3d 768, 790–91 (6th Cir. 2002); *Caribbean Broad. Sys., Ltd. v. Cable & Wireless P.L.C.*, 148 F.3d 1080, 1087 (D.C. Cir. 1998) (reversing dismissal of complaint under section 2 of the Sherman Act where defendant's anticompetitive conduct consisted of making misrepresentations to advertisers and the government in order to protect its monopoly); Merger Guidelines § 6 (unilateral effects), § 7 (coordinated effects), § 13 (significant competitive concerns including influencing and coordinating conduct, reduced incentive to compete, and shared access to non-public, competitively sensitive information among two merged firms).

efforts to achieve their goals, and those injuries are antitrust injury that give Novation standing to sue. *McCready*, 457 U.S. at 483–84. At this stage, more is not required.

The district court's "understanding of antitrust injury is too restrictive." *Glen Holly*, 352 F.3d at 374. Novation alleges that JGW's acquisition of Peachtree and subsequent exclusionary conduct "detrimentally changed the market make-up and limited consumers' choice to one source." *Id.* Many "customers no longer ha[ve] a viable choice between market alternatives." *Id.* Novation's "allegation of 'loss stems from a competition-reducing aspect or effect of [Defendants'] behavior.'" *Id.* at 378 (quoting *Atl. Richfield*, 495 U.S. at 344). "Here, as in the record now stands, there is *no* pro competitive aspect of [Defendants'] strategic alliance, none." *Glen Holly*, 352 F.3d at 377. Such conduct "'is inherently destructive of competitive conditions and may be condemned even without proof of its actual market effect.'" *Glen Holly*, 352 F.3d at 377 (quoting *Amarel*, 102 F.3d at 1509 and *Associated Gen. Contractors*, 459 U.S. at 528).

Here, as in *Theme Promotions*, Novation has alleged that "[t]he antitrust injury suffered by [Novation]—the reduction in choice of market alternatives . . . —was the direct result of [Defendants'] antitrust violation." *See Theme Promotions*, 546 F.3d at 1004.

The district court's refusal to infer that consumer choice is reduced where the parties also "broadcast television ad to compete" (ER9) improperly makes favorable inferences for Defendants and disregards Novation's allegations as to industry realities and how the market participants operate (i.e., most consumers conduct online searches on Google, often on a mobile device). The district court's statement that Novation did "not explain how Defendants' alleged advertising scheme and deceptive acts reduce consumer choice in the relevant market" (ER9) overlooks Novation's allegations that consumers are tricked into thinking Defendants' coordinated marketing and bidding activity are competitive – such that consumers are precluded from receiving a truly competitive bid from Novation or another genuine competitor. Hence, consumers and competitors are deprived of the benefit of true competition, and JGW pays less to buy settlements free from competition than it would in the face of true competition – harming consumers, competition, and Novation.

Finally, the district court suggests that Novation, as a competitor, cannot rely on consumer harm because it would dilute the antitrust injury requirement. ER9–10. This Court has rejected such a limitation. *Yellow Pages Cost Consultants, Inc. v. GTE Directories Corp.,* 951 F.2d 1158, 1163 (9th Cir. 1991) ("we disagree. . . that advertisers were more appropriate antitrust plaintiffs because they were 'persons more obviously suffering antitrust injury' and therefore better poised to

vindicate the public interest in antitrust enforcement").  In the market where competition is allegedly restrained, competitors are typically proper plaintiffs to allege antitrust injury;[15] this Court has repeatedly sustained an antitrust claim when stated by a competitor: *Pinhas v. Summit Health, Ltd.*, 894 F.2d 1024, 1032 (9th Cir. 1990), *aff'd*, 500 U.S. 322 (1991); *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1448 (9th Cir. 1988); *Indus. Bldg. Materials, Inc. v. Interchemical Corp.*, 437 F.2d 1336, 1342–43 (9th Cir. 1971).  Antitrust claims are available to victims of a practice prohibited by the antitrust laws,[16] and this Court has found impacts on services, prices, or the number of entrants in the marketplace to be sufficient antitrust injury allegations.  *Hasbrouck v. Texaco, Inc.*, 842 F.2d 1034, 1040 (9th Cir. 1988), *aff'd,* 496 U.S. 543 (1990); *Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*, 884 F.2d 504, 508–09 (9th Cir. 1989).

The Department of Justice and/or FTC's failure to challenge the merger has no preclusive effect.  Federal regulators' inability to challenge every potentially troublesome merger is precisely why Congress made private enforcement "an integral part of the congressional plan for protecting competition."  *Am. Stores*, 495

---

[15] *See, e.g.*, *see McCready*, 457 U.S. at 479; *Saint Alphonsus*, 778 F.3d at 783–92 (9th Cir. 2015); *Am. Ad Mgmt.*, 190 F.3d at 1054–61; *Yellow Pages*, 951 F.2d at 1161–64; *W. Penn*, 627 F.3d at 102 ("competitors in the restrained market" and "those whose injuries are the means by which the defendants seek to achieve their anticompetitive ends"); *AlliedSignal*, 183 F.3d at 574–76.

[16] *McCready*, 457 U.S. at 479; *Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219, 235–36 (1948); *Ostrofe v. H.S. Crocker Co.*, 740 F.2d 739, 745–46 (9th Cir. 1984).

U.S. at 284. "Courts do not generally defer to an agency's decision not to challenge a merger." *AlliedSignal*, 183 F.3d at 575; *see Tasty Baking*, 653 F. Supp. at 1255–56, 1276; *Laidlaw*, 636 F. Supp. at 1521. And presumably, when the merger was proposed to the FTC, that agency was never told that the merged companies intended to carry out a post-merger sham – by leading consumers to believe that they were shopping among brands that appeared to (but did not actually) compete with one another. *See, e.g.*, ER 67 ¶ 12, ER71–72, ¶ 25.

In sum, JGW is a dominant company that is using its market power to raise prices (depress bids), limit choices for consumers, and hold back competition from smaller rivals. These allegations suffice to satisfy the antitrust injury pleading requirement.[17]

### C. Novation alleges that JGW's post-merger abuse of its monopsony power in a highly concentrated market by engaging in pervasive anticompetitive deceptive bidding practices has caused more than a *de minimis* adverse effect on competition.

The district court properly recognized that false advertising may constitute exclusionary conduct (ER11; ER120–121; ER170–171) but erroneously concluded

---

[17] *See, e.g., Am. Stores*, 495 U.S. at 284; *Phila. Nat'l Bank*, 374 U.S. at 364–65; *Brown Shoe*, 370 U.S. at 342–46; *Saint Alphonsus*, 778 F.3d at 783–92 ("the Clayton Act does not excuse mergers that lessen competition or create monopolies simply because the merged entity can improve its operations"); *Heinz*, 246 F.3d at 716; *ProMedica*, 749 F.3d at 564–73; *AlliedSignal*, 183 F.3d at 574–76 ("Given the early procedural stage of this case and the necessarily tentative nature of the district court's conclusions, we do not believe that the district judge abused his discretion in concluding that AlliedSignal has some likelihood of showing antitrust standing"); *Tasty Baking*, 653 F. Supp. at 1254; *Laidlaw*, 636 F. Supp. at 1521; *Bazaarvoice*, 2014 WL 203966, at *64–76; *see also* Merger Guidelines §§ 2–6, 12.

that Novation failed to allege "more than a *de minimis*" effect on competition (ER11). Novation has alleged such exclusionary conduct (*see, e.g.*, ER66–68 ¶¶ 11–15, ER70–71 ¶ 23, ER80–87 ¶¶ 56–81, ER92–93 ¶¶ 98–101), and at this stage, Novation has overcome any presumption that the anticompetitive effect was *de minimis*. *Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*, 108 F.3d 1147, 1152 (9th Cir. 1997);[18] *Nat'l Ass'n of Pharm. Mfrs., Inc. v. Ayerst Labs.*, 850 F.2d 904, 915–17 (2d Cir. 1988).

Novation alleges that Defendants' deceptive marketing and coordinated bidding practices are clearly false, clearly material, clearly likely to induce reasonable reliance, made to sellers without knowledge of the subject matter, continued for prolonged periods, and are not readily susceptible of neutralization or other offset by rivals. *E.g.,* ER81–99 ¶¶ 60–79, 83–95, 104–106, 117–129.

As discussed below with respect to the Lanham Act claim, misrepresentation embraces the alleged concealment and deceptive advertising and bidding.[19]

---

[18] These facts bear no resemblance to the distribution of disparaging fliers about, and hiring a faculty member away from, a competitor. Nor does the reasoning for the *de minimis* presumption apply: "buyer distrust of a seller's disparaging comments about a rival seller should caution us against attaching much weight to isolated examples of disparagement." *Harcourt*, 108 F.3d at 1152. *Harcourt* is inapposite here.

[19] *See, e.g., In re Estate of Young*, 160 Cal. App. 4th 62, 79 (2008) (quoting *Lazar v. Superior Court*, 12 Cal. 4th 631, 638 (1996)); *Vogelsang v. Wolpert*, 227 Cal. App. 2d 102, 109 (1964); *Yamauchi v. Cotterman*, 84 F. Supp. 3d 993, 1018 (N.D. Cal. 2015); *Arch Ins. Co. v. Allegiant Prof'l Servs., Inc.*, No. 11–1675, 2012 WL 5182891, at *3–6 (C.D. Cal. Oct. 15, 2012).

Novation plausibly alleges that Defendants' advertisements actually deceived or had the tendency to deceive a substantial segment of its audience. ER82–85 ¶¶ 66–76. Whether JGW intended to deceive is not ripe for resolution.[20] Novation also alleges that JGW's false advertising is not readily 'susceptible of neutralization' by Novation or any other competitor. ER88 ¶ 88, ER 96–100 ¶¶ 117–130. Placing the burden on Novation of additional costly advertising to cure Defendants' deception is not the type of neutralization intended under the standard; and in any event, this is not a viable option (ER78–80 ¶¶ 51–55, ER93 ¶ 104) and would not successfully neutralize the public's mistaken impression or level the playing field. Moreover, regardless of Google's internal remedy for rule violators, Defendants cited no authority to suggest that a financially motivated, private company's internal policy is an exclusive remedy or a substitute for the antitrust laws.[21]

---

[20] *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1054 (9th Cir. 2008) ("knowledge and intent is a factual question"); *see Kodak*, 504 U.S. at 467; *Movie 1 & 2 v. United Artists Commc'ns, Inc.*, 909 F.2d 1245, 1255 (9th Cir. 1990); *Byars v. Bluff City News Co.*, 609 F.2d 843, 860 (6th Cir. 1979).

[21] *Cf. Pinhas*, 894 F.2d at 1032 (no requirement of exhausting administrative remedies). Are Defendants implying that this Court require the "exhaustion of Google remedies?" Are Defendants suggesting that this Court is bound by the secret rulings of a for-profit company that stands to lose millions whenever it decides to reject a lucrative source of ad revenue? If this case is allowed to proceed beyond the pleading stage, the Court will learn that Novation and others did complain about Defendants' conduct to Google. But absent discovery, Novation can't be expected to know or allege what Google did or didn't do to investigate such complaints, nor can Novation know or allege what Defendants represented to Google to deflect any such inquiries. All that is known is that Google continued to accept vast payments from Defendants. Google has been

**D.  The district court misapplied the pleading standard.**

"This Court has preferred to resolve antitrust claims on a case-by-case basis, focusing on the 'particular facts disclosed by the record.'"  *Kodak*, 504 U.S. at 467. Whether Defendants' conduct, taken as a whole, produces an adverse effect on the competitive infrastructure is a quintessential question of fact which should be decided on a motion to dismiss and has been traditionally reserved for summary judgment after discovery.  *Hosp. Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 746 (1976).  Rule 12(b)(6) does not permit dismissal of a well-pleaded complaint simply because "it strikes a savvy judge that actual proof of those facts is improbable."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  *Twombly* "does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element."  *W. Penn*, 627 F.3d at 98 (internal quotation marks omitted) (quoting *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) and *Twombly*, 550 U.S. at 556); *TruePosition, Inc. v. LM Ericsson Tel. Co.*, No. 11-4574, 2012 WL 3584626, at *3 (E.D. Pa. Aug. 21. 2012).

---

investigated by the FTC and other international competition authorities for various business practices.  https://www.ftc.gov/news-events/press-releases/2013/01/google-agrees-change-its-business-practices-resolve-ftc; *cf. In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 806 F.3d 125, 132–33, 151 (3d Cir. 2015).

The district court's dismissal should be reversed.  First, at the pleading stage, the Court is to accept all allegations as true and construe the pleadings in the light most favorable to Novation.  *Rowe v. Educ. Credit Mgmt. Corp.*, 559 F.3d 1028, 1029–30 (9th Cir. 2009); *Glen Holly*, 352 F.3d at 368.  Allegations that JGW is exploiting its illegal merger through deception and duplicity must be accepted as true at this stage.  Defendants' attempt to reshape those allegations should be rejected.  *See, e.g., Starr,* 652 F.3d at 1216–17 (plaintiff's explanation need not "be true or even probable"); *Anderson News,* 680 F.3d at 185 (court not to make choice between plausible inferences on Rule 12(b)(6) motion); *Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.* 648 F.3d 452, 458 (6th Cir. 2011).

Second, the district court's premature factual findings about the allegations of injury to competition, consumers, and competitors raise factual disputes to be investigated during discovery, and are not grounds for dismissal as a matter of law without evidentiary support.  *See Kodak*, 504 U.S. at 467; *Newcal*, 513 F.3d at 1054; *Movie 1 & 2*, 909 F.2d at 1255; *Byars*, 609 F.2d at 860 (discussing anticompetitive conduct in case involving concealing and disparaging plaintiff's product: "only a thorough analysis of each fact situation will reveal whether the monopolist's conduct is unreasonably anti-competitive and thus unlawful").

"[F]act-specific question[s] cannot be resolved on the pleadings."  *Todd v. Exxon Corp.*, 275 F.3d 191, 203 (2d Cir. 2001) (Sotomayor, J.).  "'[A]t the

pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Osborn v. Visa Inc.*, 797 F.3d 1057, 1063–64 (D.C. Cir. 2015) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992), *cert. granted*, No. 15–962, 2016 WL 379292 (June 28, 2016)); *see generally Osborn*, 797 F.3d at 1068–69.

As in *Osborn*, "the economic facts alleged by [Novation] are specific, plausible, and susceptible to proof at trial." *See id*. at 1066; *see also id*. at 1063 ("we think the District Court was demanding proof of an economic theory that was not required in a complaint"). Novation alleges that Defendants' anticompetitive conduct foreclosed competitors, reduced choice, restricted output, raised prices, and harmed consumer welfare, which satisfies the antitrust injury pleading requirement. On this record, before fact discovery, the Court should not make a finding that such foreclosure and harm to consumer welfare are implausible. A motion to dismiss "is not the occasion for evaluating the empirical accuracy of an economic theory." *Osborn*, 797 F.3d at 1065–66. These contentions are factually intense and require the benefit of discovery to properly evaluate. *See, e.g., Gelboim v. Bank of Am. Corp.*, No. 13–3565, 2016 WL 2956968, at *15–17 (2d Cir. May 23, 2016); *Osborn*, 797 F.3d at 1063–66. More specific information is solely within the possession of Defendants and third parties. *See, e.g.*, Merger

Guidelines § 2.2.  Indeed, other factoring companies that comprise the small market share not taken by JGW or Peachtree will corroborate Novation's allegations.  ER94 ¶ 105.

Third, the district court improperly rejected Novation's detailed allegations. For example, most sellers rely on Google's search engine to conduct searches for a competing bid for their structured settlement payments, often using mobile device screens where only two to three paid listings are visible on the small screen, and most users do not go beyond the first page.  ER75–76 ¶¶ 37–43.  The district court overstepped its role at the pleading stage by attributing Novation's ability to purchase "television or radio commercials, or other forms of advertising" (ER11) to discredit Novation's allegations of antitrust injury.  The district court had no evidence that sellers in the relevant market rely on radio or television ads or that such ads would be effective in overcoming JGW's deception.  In fact, such an inference defies the allegations and market realities about online advertising on Google.  Despite detailed allegations that JGW – armed with its monopsony power and array of brands – engages in a systematic campaign to buy up the top paid "Ad" listings, the district court speculated that Novation's "website may still appear in the search results" (ER11) and also concluded that consumers "remain free to choose whether to click on an 'Ad' or on any of the search results" (ER9). No evidence supports these improper factual findings.  This Court should not

determine at this stage – as a matter of law – that such conduct is per se competitive.

Finally, whether JGW intended to deceive is not ripe for resolution on a motion to dismiss in advance of discovery. *Newcal*, 513 F.3d at 1054. Discovery will reveal the nature of JGW's deceptive conduct (and who, what, where, when, and why JGW engaged in such practices). Until that fact record is developed and where, how, and how often JGW has sought to trick customers into believing they have received a competitive bid, this Court should not conclude that any anticompetitive impact is *de minimis*. *See, e.g., Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1051–52 (9th Cir. 2007) (noting that district court had allowed discovery to enable appellants to discover facts needed to plead antitrust violation); *TYR Sport*, 679 F. Supp. 2d at 1132.

These facts should survive a motion to dismiss.

## II.     Novation properly alleges a Lanham Act claim.

Relying on this Court's summary judgment analysis in *Multi Time Machine, Inc. v. Amazon.com, Inc.*, 804 F.3d 930, 939 (9th Cir. 2015), the district court overstepped its role at the motion dismiss stage by prematurely concluding that "'[n]o reasonable factfinder could find a likelihood of confusion" (ER14). In doing so, the district court rejected Novation's allegations that Defendants' false and misleading advertising (fraudulent omission) deceives or tends to deceive

consumers (ER82–86 ¶¶ 66–80), instead finding "no plausible likelihood of deception" (ER14).  Novation's allegations satisfy all elements of a Lanham Act claim at the pleading stage.

### A.     Novation satisfies Rule 9(b) and *Twombly* pleading standards.

The district court declined to address whether a heightened pleading standard applies to Novation's false advertising claims.  ER121.[22]  In any event, Novation includes detailed information about the deceptive advertising, and pleads sufficient facts to put Defendants on notice regarding the deceptive advertising practices at issue, and to describe the who, what, when, where, and how of the claim.  *See, e.g.*, ER67–100 ¶¶ 14, 21–23, 33–92, 116–130.  Novation meets its burden under all pleading standards.

### B.     Misleading advertising is actionable.

"Section 43(a) of the Lanham Act provides a remedy for a broad range of deceptive marking, packaging and marketing of goods or services in commerce." *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 841 (9th Cir. 1987)

---

[22] "The purpose of Rule 9(b) is to give defendants adequate notice of the charges being brought so they can defend against them, and to deter the filing of frivolous charges related to fraud."  *Orchard Supply Hardware LLC v. Home Depot USA, Inc.*, 967 F. Supp. 2d 1347, 1365–66 (N.D. Cal. 2013) (citing *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 (9th Cir. 1996)).  "The Ninth Circuit has yet to decide whether Federal Rule of Civil Procedure 9(b) applies to false advertising claims under the Lanham Act."  *Architectural Mailboxes, LLC v. Epoch Design, LLC*, No. 10cv974, 2011 WL 1630809, at *5 (S.D. Cal. Apr. 28, 2011); *see Homeland Housewares, LLC v. Euro-Pro Operating LLC*, No. 14–03954, 2014 WL 6892141, at *2 n.2 (C.D. Cal. Nov. 5, 2014).

(citing *Inwood Labs. v. Ives Labs.*, 456 U.S. 844, 858 (1982)). "[T]he Lanham Act 'encompasses more than blatant falsehoods'" and "'embraces innuendo, indirect intimations, and ambiguous suggestions evidenced by the consuming public's misapprehension of the hard facts underlying an advertisement.'" *William H. Morris Co. v. Grp. W, Inc.*, 66 F.3d 255, 257–58 (9th Cir. 1995) (quoting *Vidal Sassoon, Inc. v. Bristol-Myers Co.*, 661 F.2d 272, 277 (2d Cir. 1981)). "'[A] statement is actionable under § 43(a) if it is affirmatively misleading, partially incorrect, or untrue as a result of failure to disclose a material fact.'" *U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 921 (3d Cir. 1990) (citation omitted) (quoted in *K & N Eng'g, Inc. v. Spectre Performance*, No. 09-1900, 2011 WL 4387094, at *18 (C.D. Cal. Sept. 20, 2011)). "Even if an advertisement is not literally false, relief is available under Lanham Act § 43(a) if it can be shown that the advertisement has misled, confused, or deceived the consuming public." *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1140 (9th Cir. 1997). Statements that are "only misleading in context" but "not literally false" are actionable where the advertising conveyed the implied message and deceived a significant portion of the recipients. *William H. Morris*, 66 F.3d at 258 ("Where a statement is not literally false and is only misleading in context, . . . proof that the advertising actually conveyed the implied message and thereby deceived a significant portion of the recipients becomes critical."); *see Southland*

44

*Sod*, 108 F.3d at 1139 ("literally false, either on its face or by necessary implication" or "literally true but likely to mislead or confuse consumers"); ER12; ER122–123.

In *Expedia, Inc. v. Priceline.com Inc.*, No. 09-712, 2009 WL 4110851 (W.D. Wash. Nov. 23, 2009), Expedia alleged that Priceline's advertising blurred the distinction between its fixed-price and blind-bidding services, thereby creating the false impression that Expedia's fixed-price services were more costly than Priceline's services. *Id*. at *3. Expedia demanded that Priceline disclose the differences between its fixed-price and "name-your-own-price" services. *Id.* Although the "nature and scope of the desired disclosures [were] not delineated" and it was "not clear what 'false representation'" Priceline allegedly made or whether Expedia's "comparative inference" was reasonable, the court concluded the allegations sufficiently stated a Lanham Act claim. *Id.*; *see Aquashield, Inc. v. Sonitec Vortisand, Inc.*, No. 13–cv–119, 2013 WL 5524598, at *4–7 (E.D. Tenn. Oct. 4, 2013) (finding that defendant failed to meet its burden to show that plaintiffs' Lanham Act claim was futile).

A Lanham Act claim is actionable here, where, a false inference has been created, and words tend falsely to describe JGW's commonly owned and

controlled services as separate, genuinely competing entities.[23]  Novation explains

why Defendants' failure to disclose their common ownership is the omission and

concealment of a material fact about the actual nature of the services they provide.

Novation also explains how Defendants' expressly labeled "Ads" are misleading,

deceptive, and in violation of Google's double serving policy.  JGW and Peachtree

and Olive Branch are offering to *buy* the *same* settlement from a seller as opposed

to *selling* different items.  Defendants intentionally conceal and omit material facts

to courts, consumers, and Google.  These material omissions and misleading,

deceptively coordinated activity in the advertising, bidding, and approval process

enable Defendants to manipulate the competitive process.

### C.  Novation's allegations that Defendants' duplicitous advertising deceives or tends to deceive consumers present fact questions as to likelihood of confusion.

The district court rejected Novation allegations (ER81–85 ¶¶ 60–76, ER98–

100 ¶¶ 125–130) "that Defendants' advertisements actually deceived or had the

tendency to deceive a substantial segment of its audience."  ER12.  But a "failure

to establish that a significant number of consumers were actually deceived is not

necessarily fatal to [a plaintiff's] case.  If [Defendants] intentionally misled

---

[23] *Cf. Lamothe v. Atl. Recording Corp.*, 847 F.2d 1403, 1407–08 (9th Cir. 1988) (incomplete designation of source); *Gilliam v. Am. Broad. Cos., Inc.*, 538 F.2d 14, 24 (2d Cir. 1976) (false impression); *CBS, Inc. v. Gusto Records, Inc.*, 403 F. Supp. 447, 448–49 (M.D. Tenn. 1974) (misleading and deceptive marketing violated Lanham Act); *Rich v. RCA Corp.*, 390 F. Supp. 530, 530–31 (S.D.N.Y. 1975); *Skil Corp. v. Rockwell Int'l Corp.*, 375 F. Supp. 777, 783 n.11 (N.D. Ill. 1974) (false representations include "failure to disclose material facts").

consumers, we would presume consumers were in fact deceived and [Defendants] would have the burden of demonstrating otherwise." *William H. Morris*, 66 F.3d at 258.

Whether a "reasonable factfinder could find a likelihood of confusion here" (ER14) is a factual determination. *Wells Fargo & Co. v ABD Ins. & Fin. Servs., Inc.*, 758 F.3d 1069, 1073 (9th Cir. 2014) ("early in litigation . .. parties rarely have amassed significant evidence of actual confusion"); *Multi Time Mach.*, 804 F.3d at 939 ("likelihood of confusion is often a question of fact"); *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 937–40 (9th Cir. 2008). "Reactions of the public are typically tested through the use of consumer surveys." *Southland Sod*, 108 F.3d at 1140. Evidence in the form of market research or consumer surveys may be sufficient to constitute false advertising. *Apple Inc. v. Amazon.com Inc.*, 915 F. Supp. 2d 1084, 1090 (N.D. Cal. 2013).

The standard used is the typical buyer exercising ordinary caution. *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1152 (9th Cir. 2011). "The nature of the goods and the type of consumer is highly relevant to determining the likelihood of confusion in the keyword advertising context." *Id.* In this context, the "'likelihood of confusion will ultimately turn on what the consumer saw on the screen and reasonably believed, given the context.'" *Multi Time Mach.*, 804 F.3d at 937 (quoting *Network Automation*, 638 F.3d at 1153). "In

other words, the case will turn on the answers to the following two questions: (1) Who is the relevant reasonable consumer?; and (2) What would he reasonably believe based on what he saw on the screen?" *Multi Time Mach.*, 804 F.3d at 937. Emerging technologies require a flexible approach. *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1054 (9th Cir. 1999); *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1207 (9th Cir. 2000) ("the Web, as a marketing channel, is particularly susceptible to a likelihood of confusion since, as it did in this case, it allows for competing marks to be encountered at the same time, on the same screen").

The district court concluded that someone seeking to sell a big settlement would "exercise a heightened degree of care and precision" and rely on "advisors." ER14. But how do even diligent sellers who scroll down until they think they find competing bids know they've spent hours on the phone talking to shills? The district court's conclusion ignores allegations that each privately negotiated bidding transaction is a time-consuming and detailed process requiring hours on the phone (ER77–78 ¶¶ 47–49), not a few simple clicks. As alleged, consumers cannot make price comparisons online as there is no published pricing information. ER77 ¶ 47. And Novation alleges that the "present system has ensured that even price-sensitive consumers who do try to shop will often only find" JGW, Peachtree, and Olive Branch displayed. ER90 ¶ 91. The district court's premature

conclusion that the "relevant reasonable consumer would exercise a heightened degree of care and precision" and rely on "advisors" erroneously infers facts favorable to Defendants that directly contradict Novation's allegations.

The district court questioned whether "reasonable consumers are aware of Google's internal advertising policy" (ER14). But consumers' awareness is immaterial to whether they are or may tend to be deceived by JGW's violation of Google's "abuse of the ad network" double-serving policy. The policy exists to prevent a single entity from crowding out competitors, and JGW's conduct is designed to deceive sellers into soliciting "competing" bids from a single JGW source. Regardless of whether "reasonable consumers are aware of Google's internal advertising policy" (ER14), it does not conclusively follow that consumers are not tricked. Google "users' assumption and understanding is that each result they are shown is from a different company or service – especially if each [appears] to be different by virtue of common visual cues and labels such as trademarked name, brand, phone number, and logo." ER98–99 ¶ 125.

JGW misrepresents the source and affiliation of its service by using three brands to make it appear that the service offered by each brand comes from a distinct source. ER96–100 ¶¶ 117–130. Sellers who invite Peachtree or Olive Branch to bid as an alternative to JGW do so because each brand falsely presents itself as being different and having different sources of money. In fact, all three

brands share a common source of money. Using a brand to mislead consumers as to the source of a service violates the Lanham Act. Initial interest confusion establishes a likelihood to deceive. ER96–98¶¶ 118–122; *Brookfield*, 174 F.3d at 1062; *Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1025–31 (9th Cir. 2004) (finding genuine issues of material fact where linked advertisements were likely to mislead customers into believing they had followed a link to the company's website for which they were originally searching).

## III.  Novation adequately states a UCL claim.

The UCL prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. This language is "broad" and "sweeping" to "protect both consumers and competitors by promoting fair competition in commercial markets for goods and services." *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 320 (2011). To state a claim under the UCL "based on false advertising or promotional practices, it is necessary only to show that members of the public are likely to be deceived." *In re Tobacco II Cases*, 46 Cal. 4th 298, 312 (2009) (citation and internal quotation marks omitted). Where consumers are "deceived by misrepresentations into making a purchase," the economic harm is that "the consumer has purchased a product that he or she *paid more for* than he or she otherwise might have been willing to pay if the product had been labeled

accurately." *Kwikset*, 51 Cal. 4th at 329 (emphasis in original). "[I]n effect, California has created what amounts to a conclusive presumption that when a defendant puts out tainted bait and a person sees it and bites, the defendant has caused an injury." *Pulaski*, 802 F.3d at 986; *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1021 n.13 (9th Cir. 2011).

If this Court determines that Novation sufficiently pled any of its claims—or that Defendants' conduct is "unfair" because it threatens competition or fraudulent because members of the public are likely to be deceived[24]—it should find that Novation's UCL claim is adequately pled.

As previously briefed, Novation has plausibly alleged a claim under Section 7 of the Clayton Act, Section 2 of the Sherman Act, and Section 43(a) of the Lanham Act. Novation's antitrust and Lanham Act claims serve as a sufficient predicate for its UCL claim. Additionally, it would be premature to dismiss this case without allowing Novation to develop an evidentiary record showing an actual or threatened impact on competition. *See, e.g., DocMagic, Inc. v. Ellie Mae, Inc.*, 745 F. Supp. 2d 1119, 1147 (N.D. Cal. 2010) ("On its face, the California definition of 'unfair' competition appears to embrace conduct that might not violate the Sherman Act."); *Sun Microsystems, Inc. v. Microsoft Corp.*, 87 F. Supp.

---

[24] Allegations of fraudulent conduct must be pleaded with particularity and comply with Rule 9(b). *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003); ER124 n.1.

2d 992, 999–1000 (N.D. Cal. 2000); *Korea Kumho Petrochemical v. Flexsys Am. LP*, No. 07–1057, 2008 WL 686834, at *9 (N.D. Cal. Mar. 11, 2008) ("An act need not violate the antitrust laws to be actionable by a competitor as unfair.").

## Conclusion

The district court's dismissal should be reversed.

DATE: August 1, 2016   Respectfully submitted,

BLECHER COLLINS & PEPPERMAN, P.C.

By:  /s/ Maxwell M. Blecher
     Maxwell M. Blecher
     Attorneys for Plaintiff-Appellant

## Request for Oral Argument

Plaintiff-Appellant Novation Ventures, LLC respectfully requests that this Court hear oral argument in this case.

**Statement of Related Cases**

Pursuant to Ninth Circuit Rule 28-2.6, Plaintiff-Appellant Novation Ventures, LLC states that it is not aware of any other related cases pending in this Court.

**Certificate of Compliance**

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, and Ninth Circuit Rule 32-1, Plaintiff-Appellant Novation Ventures, LLC hereby certifies that this Opening Brief is proportionately spaced, has a typeface of 14-point, and contains 12,974 words.

DATE: August 1, 2016          Respectfully submitted,

                                        BLECHER COLLINS & PEPPERMAN, P.C.

                                        By:    /s/ Maxwell M. Blecher
                                                    Maxwell M. Blecher
                                              Attorneys for Plaintiff-Appellant

**Certificate of Service**

9th Circuit Case Number 16-55289

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on August 1, 2016.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


_____/s/ Maxwell M. Blecher_____

82518.2